UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CAMERON FOREST MILES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25 CV 1350 RWS |
| | ) | |
| FRANK BISIGNANO, Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Cameron Forest Miles brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the Commissioner's decision denying his applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. For the reasons set forth below, I will reverse the decision of the Commissioner and remand this matter for further proceedings.

**Procedural History**

On March 31, 2022, Miles applied for SSI and DIB, alleging that he became disabled on the date of his birth, June 3, 1994. (Tr. 225-35.) He alleges that he has been unable to work as a result of his autism, developmental encephalopathy,

attention deficit hyperactivity disorder (ADHD), seizures, migraines, a primary sleep disorder, and bladder diverticulum. (Tr. 248, 271.)

Miles's applications were initially denied on July 29, 2022. (Tr. 115-24.) On January 23, 2023, the applications were denied again upon reconsideration. (Tr. 135-42.) Miles then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 161-62.) Following a hearing, the ALJ issued an unfavorable decision on August 13, 2024, and the Appeals Council denied Miles's request for review on July 15, 2025. (Tr. 1-5, 13-28.) Thus, the ALJ's decision is now the final decision of the Commissioner. 42 U.S.C. §§ 405(g) and 1383(c)(3).

In this action for judicial review, Miles contends that the ALJ failed to properly evaluate the severity of his migraines, improperly discounted his subjective statements about his pain and other symptoms, improperly evaluated the medical opinion evidence, all of which caused the ALJ to assess a residual functional capacity (RFC) that is not supported by substantial evidence.

**Evidence Before the ALJ**

In an adult disability report, Miles's mother stated that he was diagnosed with seizures and migraines when he was a child. (Tr. 253-54.) With the assistance of his mother, Miles stated in an adult function report that his impairments affected his ability to work because he needed long periods of time to fully wake up in the mornings, he could not drive because of his seizures and

migraines, he could not wait outside for the bus when it was cold because he would get a migraine, his headaches became much worse when he worked more than two days in a row, he frequently overlooked things because he was easily distracted and had seizures, and he had difficulty interacting with others. (Tr. 287.) Miles stated that he had a primary sleep disorder, his migraines often interfered with his sleep at night and made him tired during the day, and he usually needed to urinate multiple times during the night as a result of his bladder diverticulum. (Tr. 288.) He became easily distracted, overwhelmed, and tired because of his autism, absence seizures, migraines, and sensitive hearing. (Tr. 290-92.) Miles stated that he had been referred for genetic testing and counseling and that additional medical records concerning his bladder diverticulum could be found through Dr. Erica Traxel at St. Louis Children's Hospital. (Tr. 294.) Dr. Traxel had diagnosed his bladder diverticulum using a cystoscopy, prescribed antibiotics, and instructed him to drink more water every day and to double-void his bladder when he urinated.[1] (*Id.*)

---

[1]The record does not appear to contain any medical records from Dr. Traxel, but the instructions Miles received from her match the instructions noted in his later individual service plan, which suggests that Dr. Traxel is Miles's urologist. *See* (Tr. 627-28.) On remand, the ALJ may wish to develop the record with respect to Miles's bladder diverticulum and any other impairments for which he may have insufficient evidence to determine whether Miles is disabled. *See Noerper v. Saul*, 964 F.3d 738, 747 (8th Cir. 2020) (explaining that the ALJ's duty to develop the record arises from the simple fact that the disability determination process is not an adversarial process); *see also Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (stating that the ALJ may order medical examinations and tests when the medical records are insufficient to determine whether the claimant is disabled).

Miles's medical records showed that he began seeking treatment for his migraines, seizures, autism, and developmental encephalopathy from neurologist Dr. John Mantovani and pediatric psychiatrist Dr. Scott Trail in 2004 and 2005. (Tr. 388). Dr. Trail prescribed Depakote and Maxalt for Miles's migraines and seizures in 2008, but Dr. Trail's medical records show that he was still having breakthrough migraine headaches while he was taking the medications between 2008 and 2011. (Tr. 362-63, 366, 377, 385.) In January 2010, Dr. Trail wrote a note for Miles requesting that his school allow him to start his school day after 8:30 a.m., explaining that Miles's seizure disorder, primary sleep disorder, ADHD, Asperger syndrome, and prescribed medications had caused chronic issues with fatigue, sleep difficulties, significant morning tiredness, and difficulty waking. (Tr. 725). In February 2010, Dr. Trail referred Miles to Dr. Mantovani for another evaluation. Dr. Mantovani confirmed Miles's diagnoses of developmental encephalopathy, ADHD, Asperger syndrome, seizure disorder, and migraine headaches, and he recommended obtained an EEG. (Tr. 726.) Dr. Mantovani's clinical notes regarding Miles's February 2010 electroencephalogram indicated that Miles was sleep deprived and that the results were "mildly abnormal due to accentuation of paroxysmal features." (Tr. 406.) Later in 2010, Miles stopped taking the medications because he was experiencing side effects, and Dr. Trail indicated that the February EEG showed that Miles was still having absence

seizures, and Miles was reporting that he was still experiencing headaches. (Tr. 368.) In April 2021, Miles began seeing Dr. Justin Steinkamp and reported experiencing three to four migraines per month that lasted between a few hours and an entire day. (Tr. 434-37.) Dr. Steinkamp diagnosed him with absence seizures, migraines with auras, and congenital bladder diverticulum, and he prescribed Ubrelvy and topiramate for Miles's migraines and seizures. (Tr. 435, 437.) In April 2022, Miles reported that his insurance no longer covered Ubrelvy, so Dr. Steinkamp prescribed Nurtec instead. (Tr. 424.)

In January 2023, Dr. David Vera conducted a consultative physical examination in which Miles reported experiencing seizures multiple times per day, some of which were minute and could go undetected, while others were worse and brought on migraines. (Tr. 614.) Miles explained that the number of migraines he experienced varied from 1 to 10 per month, noting that his migraines typically lasted 24 to 36 hours, and he rated the pain as an 8-9/10 on average. (Tr. 615.) During his migraines, Miles experienced photophobia, sound sensitivity, changes in vision, nausea, and vomiting, and he usually needed to rest in a dark room to wait for the migraines to pass. (*Id.*) Miles also reported that his bladder diverticulum affected him on a daily basis because he was constantly required to drink water and use the restroom. (*Id.*) Miles's mother reported that he was diagnosed with a primary sleep disorder with enuresis in 2005 and that he had

severe difficulty waking up in the morning. (*Id.*) Miles stated that he did not sleep well and sometimes felt more fatigued after sleeping. (*Id.*) Dr. Vera noted that Miles had difficulty initiating and maintaining conversations as a result of his autism and ADHD, experienced multiple absence seizures on a daily basis, and suffered 1 to 10 migraines per month that lasted 1 to 1.5 days and were "debilitating in nature, requiring extended rest during and after." (Tr. 618.)

In June 2023, Dr. Steinkamp had added insomnia, chronic migraines, episodic migraines, acute migraines, cluster headaches, and hypersomnia to Miles's diagnoses, noted that he reported 4 headache days per week, added a prescription for Qulipta, and referred him to a neurological telehealth appointment and a sleep study. (Tr. 636, 646, 648.) In September 2023, Dr. Steinkamp noted that Miles was still reporting three to four headaches per week, stated that Miles's sleep study demonstrated hypersomnia, and added a prescription for sumatriptan for his migraines. (Tr. 644.)

In mid-2023, Miles was approved for an individualized plan for employment that provided vocational rehabilitation training and ADA paratransit services. (Tr. 621-35.) Service coordinator Margalyn Wheatley noted in Miles's plan that his mother scheduled and attended all his doctor appointments, that Miles continued to participate in migraine and sleep studies, that he has frequent seizures and migraines, and that his urologist had advised that Miles needed to have access to a

water bottle to completely fill his bladder and was required to double void his bladder because of his frequent infections. (Tr. 627-28.)

As part of his individualized plan for employment, Miles received on-the-job training at Jackson Pianos, where he learned to tune and maintain pianos and other equipment on Mondays, Wednesdays, and Fridays from 10:00 a.m. until 3:30 p.m. (Tr. 755.) He was assigned a vocational rehabilitation counselor named Jessica Miller, who met with him every four to six weeks to discuss his progress and identify strategies for any concerns or barriers to employment. (Tr. 755, 797.) In July 2023, Miles reported to Miller that his migraines had gotten worse and that he was waiting to see a neurologist. (Tr. 782.) In June 2024, Miles told Miller that his schedule had changed to six hours per day on Mondays, Wednesdays, and Thursdays, and he expressed concern about being able to adjust to working two days in a row. (Tr. 815.)

At his July 1, 2024 hearing before the ALJ, Miles testified that he had struggled with feeling beaten down and overwhelmed at work after his five-hour shifts. (Tr. 50.) He stated that at the end of a long day at work, he experienced extremely painful headaches that required "a full day to go away." (*Id.*) Miles explained that the migraines and sensory overload he experienced from work were part of why he needed a day off between workdays to rest and decompress. (Tr. 50-51.) His migraines came and went "all the time" and were "brought on by

weather, work, stress, sometimes nothing, flashing lights, [and] all kinds of stuff." (Tr. 52.) Miles testified that he had tried many different medications, but none of them had fully treated his migraines, and despite having taken many medical tests, his doctors did not know what caused them or how best to treat them. (Tr. 53.) He said that when he had a migraine, he had to lay down and rest for however long it took his migraine to go away. (Tr. 52-53.) Ubrelvy had helped relieve his pain sometimes, but it did not help other times, and that medication was no longer covered by his insurance. (Tr. 53-54.) Miles continued that his migraines were tied to his absences seizures and that his doctor had told him that his EEG had shown that his seizures "were happening all the time." (Tr. 54-55.) He said that he also slept poorly—which contributed to his chronic fatigue, migraines, and epilepsy—and his doctors recently discovered that he had hypersomnia in addition to insomnia from a sleep study. (Tr. 55.)

After Miles testified, the ALJ heard from a vocational expert (VE), who told him that a hypothetical person with Miles's limitations could perform light and unskilled work as a dining room attendant, retail clerk, or janitor. (Tr. 64-65.) The ALJ asked whether a hypothetical person who had Miles's limitations and had at least two absences from work per month could maintain employment without a special accommodation, and the VE responded, "No." (Tr. 65.) The VE also testified that if a hypothetical person with Miles's limitations required a significant

amount of task redirection, he would likely have difficulty maintaining employment. (Tr. 65-66.)

## Discussion

### A. Legal Standard

To be eligible for disability insurance benefits under the Social Security Act, a plaintiff must prove that he is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity (SGA). If not, the disability

analysis proceeds to Step Two in which the Commissioner decides whether the claimant has an impairment or combination of impairments that is "severe," meaning that it significantly limits his ability to do basic work activities. If the claimant's impairment or combination of impairments is not severe, then he is not disabled and the analysis ends. If the claimant has a severe impairment, the Commissioner then proceeds to Step Three and determines whether the claimant's impairment or combination of impairments meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If the claimant's impairment or combination of impairments is equivalent to one of the listed impairments, he is disabled. If the impairment is not equivalent to a listed impairment, then the Commissioner proceeds to Step Four to determine whether the claimant can perform his past relevant work. If so, then the claimant is not disabled. If the Commissioner finds at Step Four that the claimant cannot return to past relevant work or does not have any past relevant work, then at Step Five, the burden shifts to the Commissioner, who must then prove that the claimant retains the RFC to do other work that exists in substantial numbers in the national economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).

Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). "Substantial evidence is more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 97 (2019) (citation modified). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

I must consider evidence that supports the Commissioner's decision as well as any evidence that fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

When evaluating medical opinions and prior administrative medical findings, the ALJ will consider various factors, the "most important factors" being supportability and consistency. 20 C.F.R. § 404.1520c(a). The ALJ must "articulate in [his] determination or decision how persuasive [he] find[s] all of the

medical opinions and all of the prior administrative medical findings in your case record." *Id.* at § 404.1520c(b).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the claimant, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See e.g., Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> [The] claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Id.* at 1322. When an ALJ explicitly finds that the claimant's testimony is inconsistent with the record as a whole and gives good reasons for the findings, the court will usually defer to the ALJ's finding. *Casey v. Astrue*, 503 F.3d 687, 696 (8th Cir. 2007). However, the ALJ retains the responsibility of developing a full and fair record in the non-adversarial administrative proceeding. *Hildebrand v. Barnhart*, 302 F.3d 836, 838 (8th Cir. 2002).

B. The ALJ's Decision

In his written decision, the ALJ found at Step One that Miles had not engaged in substantial gainful activity since July 1, 2017, the date he was first insured. (Tr. 16.) At Step Two, the ALJ found that Miles had the following severe impairments: autism spectrum disorder, a seizure disorder, scoliosis, and asthma. (*Id.*) The ALJ found that Miles's developmental encephalopathy, bladder diverticulum, migraines, and primary sleep disorder were non-severe impairments. (*Id.* at 16-17.) At Step Three, the ALJ determined that Miles did not have an impairment or combination of impairments that met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 17.) The ALJ found that Miles had the RFC to perform light work with the following limitations:

> [T]he claimant cannot climb ladders, ropes, or scaffolds and can frequently climb stairs and ramps. He must avoid concentrated exposure to extreme cold and vibration and needs to avoid concentrated exposure to pulmonary irritants such as dust, fumes, and gases. He must avoid hazards such as unprotected heights and dangerous machinery. The claimant is limited to work involving simple, routine tasks and simple work-related decisions. He can perform work that involves occasional interaction with the public and coworkers. He cannot perform fast-paced work such as work on an assembly line.

(Tr. 19.) At Step Four, the ALJ found that Miles had no past relevant work. (Tr. 27.) After considering Miles's age, high school education, work experience, and RFC, at Step Five, the ALJ determined that there were jobs in the national economy that Miles could perform despite his limitations, such as dining room

attendant, retail clerk, and janitorial work. (Tr. 27-28.) The ALJ therefore determined that Miles was not disabled since June 3, 1994. (Tr. 28.)

Miles contends that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly evaluate the severity of his migraines, his subjective statements about his pain and other symptoms, and the medical opinion evidence. As a result, Miles argues, the ALJ assessed an RFC that is not supported by substantial evidence.

C. <u>The ALJ Improperly Evaluated the Severity of Miles's Migraines</u>

"When considering whether the ALJ properly denied social security benefits, [federal courts] determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011). Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law. *Id.* "An ALJ commits legal error if the ALJ fails to correctly follow the sequential evaluation process." *Id.* (citing *Goff v. Barnhart*, 421 F.3d 785, 789-90 (8th Cir. 2005)).

At Step Two, the ALJ must determine whether a claimant has a severe medically determinable physical or mental impairment or a combination of impairments that is severe and is expected to last for at least 12 months. 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). The ALJ must "consider an individual's

symptoms and functional limitations to determine whether his or her impairment(s) is severe unless the objective medical evidence alone establishes a severe medically determinable impairment or combination of impairments that meets our duration requirement." Social Security Ruling (SSR) 16-3p, 2016 WL 1119029, at *10. "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities are those abilities and aptitudes necessary to do most jobs. 20 C.F.R. §§ 404.1521(b), 416.921(b). An impairment is not severe if it amounts to only a slight abnormality that would have no more than a minimal effect on the claimant's ability to work. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). While a claimant has the burden of showing a severe impairment that significantly limits his physical or mental ability to perform basic work activities, the burden at this stage of analysis is not great. *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

At Step Two, the ALJ acknowledged that Miles had testified that he experienced migraines after working a full day and that his migraines usually lasted for an entire day. (Tr. 16.) The ALJ also acknowledged that Miles had been diagnosed with migraine headaches but then stated that "this impairment is not sufficiently documented to cause additional limitation," citing a single page of the certified administrative transcript. (*Id.*) Thus, the ALJ determined that his

migraines were a non-severe impairment. (*Id.*) While ALJ recited the applicable standard for Step Two in the "Applicable Law" section of his decision (Tr. 14) (stating that an impairment or combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities; citing SSRs 85-28 and 16-3p), in the later Step Two analysis, the ALJ cited the standard found in SSR 19-4p and found that Miles's migraines were not severe (Tr. 16). The following appears to be the crux of the ALJ's severity analysis for Miles's migraines:

> During the relevant time period, there is no detailed description from an acceptable medical source of a typical headache event, including all associated phenomena; the frequency of headache events; adherence to prescribed treatment; and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day. Accordingly, the undersigned does not find the claimant's alleged headaches to be a severe impairment.

(*Id.*) The above language closely tracks the language in SSR 19-4p's explanation of how the Social Security Administration evaluates a medically determinable impairment of a primary headache disorder under the listing of impairments at Step Three. *See* SSR 19-4p, 2019 WL 4169635, at *7. Thus, the ALJ appears to have based his severity finding on his determination that the objective medical evidence did not establish that Miles's migraines met or medically equaled paragraph B of listing 11.02. (Tr. 16.) But that is the standard the ALJ should have used to evaluate Miles's migraines at Step Three, not Step Two.

The ALJ's failure to correctly follow the sequential evaluation process and apply the correct standard at Step Two was legal error, *see Collins*, 648 F.3d at 871, and I cannot say that this error was harmless. Establishing that an impairment is severe is not a difficult burden to meet, and—contrary to the ALJ's statement that Miles's migraines were not sufficiently documented to cause additional limitation—the record contains ample evidence that Miles's migraines significantly limited his abilities to do basic work activities.

Miles, his mother, and his doctors said that his migraines were severe, long-lasting, and debilitating. (Tr. 50, 52-54, 377, 385 437, 615, 618.) Miles testified that he had migraines "all the time." (Tr. 52.) He explained that they were "brought on by weather, work, stress, sometimes nothing, flashing lights, all kinds of stuff," they often required a day or more to pass, and he . (Tr. 50-54.) After being diagnosed as a child, Miles was reevaluated in 2010 by a neurologist, who ran an EEG and confirmed that Miles had developmental encephalopathy, ADHD, Asperger syndrome, a seizure disorder, and migraine headaches. (Tr. 405, 726.) The medical records show that Miles sought and received treatment for his migraines headaches and other impairments in the decades since he was first diagnosed (Tr. 362-63, 366, 368, 377, 385, 388, 434-37, 726), and the record does not indicate that his migraines and seizures were well-controlled by the medications he was prescribed. Miles's physicians often adjusted his prescriptions

before and during the relevant time period, and when he had a migraine, he had to lay down and rest for however long it took his migraine to go away.[2] (Tr. 52-54, 368, 375, 379, 381, 383, 424, 615, 648.) Ubrelvy was the most effective medication for Miles, but even that medication was "very hit or miss," and his insurance stopped covering it. (Tr. 54, 424, 451, 615.) Even the single page cited in the ALJ's Step Two analysis does not support the conclusion that Miles's migraines were not sufficiently documented to cause additional limitations because Miles reported at that appointment that he was experiencing three to four migraines per month and that each could last a full day, and Dr. Steinkamp adjusted his migraine prescriptions yet again. (Tr. 437.)

I cannot say that the failure to properly evaluate the severity of Miles's migraines was harmless because the ALJ's failure to consider Miles's migraines—as well as his developmental encephalopathy, bladder diverticulum, and primary sleep disorder—severe at Step Two apparently caused him to overlook the symptoms of his migraines at later Steps. *See* (Tr. 17-27); 20 C.F.R. §§404.1520(e), 404.1545(a)(2) (requiring the ALJ to consider both severe and non-severe impairments in determining the claimant's RFC). Moreover, the VE

---

[2]The ALJ appears to have relied almost solely on the evidence from the relevant time period to the exclusion of evidence prior to July 1, 2017, but evidence from outside the insured period can and should be used on remand to help elucidate Miles's medical conditions during the time for which benefits might be rewarded. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

specifically testified that a person with Miles's limitations would not be able to maintain employment at a job requiring light and unskilled work if he missed two or more days of work per month (Tr. 65), and the uncontradicted record evidence indicates that Miles cannot miss fewer than two days of work per week. (Tr. 50-55, 61-62, 287.)

Because I conclude that remand is necessary due to the ALJ's failure to properly follow the sequential evaluation process and apply the correct standard at Step Two, I need not address Miles's remaining arguments that the ALJ improperly evaluated the medical opinion evidence, improperly discounted his subjective statements regarding his pain and other symptoms, and assessed an RFC that is not supported by substantial evidence. I note, however, that it is unclear whether the ALJ improperly discounted or failed to consider Miles's subjective complaints about his pain and other symptoms because the decision does not explain why the ALJ found that Miles's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). It is also unclear whether the ALJ failed to consider the combined effect of Miles's severe

impairments with his non-severe impairments in reaching his RFC determination. *See Reinhart v. Sec'y of Health & Hum. Servs.*, 733 F.2d 571, 573 (8th Cir. 1984) ("The ALJ was obligated to consider the combined effect of [Miles]'s impairments." (citing 20 C.F.R. § 404.1522)); *Layton v. Heckler*, 726 F.2d 440, 442-43 (8th Cir. 1984) ("Each illness standing alone, measured in the abstract, may not be disabling. But disability claimants are not to be evaluated as having several hypothetical and isolated illnesses. These claimants are real people and entitled to have their disabilities measured in terms of their total physiological well-being." (quoting *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974))).

Accordingly, on remand, the ALJ should consider the severity of Miles's migraines and other impairments under the applicable standards at Step Two. *See* SSRs 85-28 and 16-3p. In assessing Miles's RFC, the ALJ should properly consider and evaluate Miles's subjective statements regarding his pain and other symptoms, and he should consider the combined effect of Miles's severe and non-severe impairments. The ALJ may also wish to more fully develop the record with respect to the impairments he determined were not severe, as there appear to be records from Miles's urologist, neurologist, and other physicians that are missing from the current record.

## Conclusion

For the foregoing reasons, the ALJ's decision is based on legal error and is not supported by substantial evidence in the record as a whole. As a result, this case will be remanded for the ALJ to specifically address the issues outlined above.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further proceedings in accordance with this memorandum and order.

A separate Judgment is entered herewith.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 30th day of September, 2026.